IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| United States of America, | Case No. 3:13 CR 369 |
| Plaintiff, | MEMORANDUM OPINION AND ORDER |
| -vs- | JUDGE JACK ZOUHARY |
| Patrick Hammond, | |
| Defendant. | |

### INTRODUCTION

Pending before the Court is Defendant Patrick Hammond's Motion to Suppress Evidence and the Government's response (Docs. 14–15). This Court held a suppression hearing where the Government offered the testimony of three witnesses (Ohio State Highway Patrol Sergeant Wyckhouse, Lake Township Police Sergeant Simms, and Ohio State Highway Patrol Sergeant Ashenfelter) and exhibits (ECF 10/18/13). For the following reasons, Hammond's Motion is denied.

### BACKGROUND

On June 20, 2013, Hammond, traveling south on I-280 near Lake Township, Ohio, was pulled over by Ohio State Highway Patrol Sergeant Wyckhouse. Wyckhouse observed Hammond commit a lane violation when Hammond crossed a solid lane line, drifting to his right, across the highway gore, and into a lane reserved for vehicles seeking to merge onto I-280.

Wyckhouse initially questioned Hammond about his erratic driving and visible nervousness and learned Hammond was on federal supervised release stemming from a bank robbery conviction.

Wyckhouse, returning to his cruiser, ran Hammond's information. He returned to Hammond, approaching this time from the left of Hammond's vehicle. Hammond began reaching near his waistband, despite Wyckhouse's orders not to, and struggled with Wyckhouse before Wyckhouse wrestled from Hammond an empty black plastic bag. Wyckhouse noted loose ammunition near Hammond's feet.

Citing safety concerns, Wyckhouse asked Hammond to exit the vehicle. Hammond exited the car and then shoved Wyckhouse, sending the trooper backward into a lane of oncoming traffic. Hammond fled between the rear of his car and the front of Wyckhouse's cruiser, leapt over the highway guardrail and ran down into a nearby ditch.

All of these events -- the initial stop, Wyckhouse's questioning, the assault on Wyckhouse, and Hammond's flight -- were captured by Wyckhouse's cruiser dashcam, footage from which the Government played at the hearing. Wyckhouse additionally testified that as Hammond fled he dropped a white plastic bag containing a .38-caliber revolver beyond view of the dashcam.

Wyckhouse and Hammond had a brief standoff, which ended when Hammond decided to flee the scene for good. One day later, Lake Township Police received a tip from a nearby business that led to the discovery of Hammond hidden amid rows of semitrucks at a truck stop. When discovered, Hammond was arrested, and made incriminating statements to Police Sergeant Simms prior to receiving *Miranda* warnings. According to Simms, Hammond said something to the effect of, "you got me," when asked for identification (Unoffic. Tr. at 41–42). During the walk from Hammond's hiding place to a police cruiser, Hammond asked how extensive the search for him had been. Simms described the exchange that followed: "And I said that we, you you know, when somebody has a gun towards -- and threatens an officer we take that personal[,] we want to [make] sure that we catch that person and [Hammond's] comment was that he never . . . pointed the gun at the officer" (*id.* at 42).

2

On June 22, Ohio State Highway Patrol Sergeant Ashenfelter interviewed Hammond, now detained at the Wood County Justice Center. The interrogation lasted roughly 45 minutes. Before questioning began, Ashenfelter took two steps. First, Ashenfelter arranged for the interview to be videotaped. However, Ashenfelter testified that because of technical difficulties, audio of the interrogation was not captured. Second, Ashenfelter secured Hammond's signature on a form titled "Constitutional Rights Waiver" (*See* Doc. 15-1). Ashenfelter testified, and the video shows, he walked Hammond through the form, explaining it line-by-line, and that Hammond had no trouble understanding the form's import. Contained in the video is footage of Hammond signing the *Miranda* waiver. Ashenfelter took notes during the interview. He generally questioned Hammond about where Hammond had obtained the revolver and other possible crimes. Hammond again made incriminating statements.

### DISCUSSION

*Traffic Stop*

Hammond first seeks to suppress all physical evidence discovered as a result of the traffic stop. The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." An individual's detention is "reasonable" for purposes of the Amendment if based on probable cause. In the context of a traffic stop, so long as "the police have probable cause to believe that a traffic violation has occurred," *Whren v. United States*, 517 U.S. 806, 810 (1996), the initial detention is reasonable. Further, an officer may order a vehicle's occupant out of the vehicle. *Pennsylvania v. Mimms*, 434 U.S. 106, 111 n.6 (1977) ("[O]nce a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures.").

3

The Government presented evidence that the traffic stop was based on probable cause that a traffic violation had occurred. Wyckhouse's cruiser dashcam clearly shows Hammond veer onto the I-280 South onramp, a violation of Ohio Revised Code §§ 4511.202 and 4511.33.

Had Wyckhouse detained Hammond for an unreasonably long time "investigating" the lane violation, the stop, initially appropriate, could have ceased to be so before Hammond made the ill-advised decision to flee the scene. *See Florida v. Royer*, 460 U.S. 491, 500 (1983) ("[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop."). Wyckhouse's dashcam recorded the precise duration of the traffic stop. According to the video's time stamp, just seven minutes passed from when Wyckhouse activated his cruiser's emergency lights (2:00 p.m.) to Hammond's flight from the vehicle, when Wyckhouse testified Hammond dropped the revolver. Seven minutes can hardly be deemed "too long" in the context of a traffic stop.

In brief, the Government presents additional arguments for why the evidence gathered on June 20 need not be suppressed (*see* Doc. 15 at 3–5). This Court does not reach those arguments because the cruiser dashcam video, together with Wyckhouse's testimony about the events captured on film, suffice. The stop was reasonable from the start, remained reasonable until Hammond's flight, and so the evidence discovered during and after that stop need not be suppressed.

### *Miranda*

Hammond next seeks to suppress two sets of statements. First, Hammond seeks to bar admission of statements he made to Simms on June 21 when discovered at the truck stop. Second, Hammond seeks to suppress statements made to Ashenfelter at the Wood County Justice Center on June 22. Both encounters, Hammond argues, violated his Fifth Amendment privilege against self-incrimination.

4

That privilege receives protection through the familiar rule in *Miranda v. Arizona*, 384 U.S. 436, 444 (1966), requiring an individual to be informed of his *Miranda* rights before custodial interrogation may begin.  For purposes of the rule, "custodial" means questioning "after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* The statements sought to be suppressed must also have been made in the course of an interrogation, or after statements or actions on the part of police "that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). In determining what is "reasonably likely" to elicit such a response, this Court "focuses primarily upon the perceptions of the suspect, rather than the intent of the police" in view of *Miranda*'s purpose to provide "an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police." *Id*.  An "interrogation," however, is not synonymous with a confession; "[v]olunteered statements of any kind are not barred by the Fifth Amendment." *Miranda*, 384 U.S. at 478.  Nor are those questions "normally attendant to arrest and custody" considered part of an interrogation for *Miranda* purposes. *United States v. Woods*, 711 F.3d 737, 741 (6th Cir. 2013).

### 1.     **Statements to Lake Township Police**

As noted above, at the suppression hearing Simms testified that Hammond made three statements -- one of identification, the second conceding his flight by asking about the ensuing manhunt, the third denying he ever pointed a gun at police during the traffic stop and subsequent standoff -- immediately after his apprehension by Lake Township Police.  None of these statements is inadmissible under *Miranda*, despite the fact that all three statements were made prior to police recitation of Hammond's *Miranda* protections.  Simms' questioning Hammond about his identity is an inquiry "normally attendant to arrest and custody," and so not part of an interrogation. *Woods*, 711

5

F.3d at 741 (quoting *Innis*, 446 U.S. at 301) (internal quotation mark omitted); *see also id.* (citing *United States v. Lawrence*, 952 F.2d 1034, 1036 (8th Cir. 1992) (holding that "a few routine identification questions necessary for booking purposes" were not part of a custodial interrogation)).

Likewise, this Court heard no testimony to suggest that any police action, coercive or otherwise, prompted Hammond's curiosity about the manhunt that followed his flight from Wyckhouse. Hammond was only being led to a waiting police cruiser. As such, that statement was volunteered, and so not the product of a custodial interrogation.

Finally, Hammond's third comment did not come in response to police "interrogation," as *Miranda* defines that term. As noted above, this exchange immediately followed Hammond's inquiry about the scope of the search. Simms responded, in substance, that when a suspect has a gun and threatens an officer the police take such altercations seriously and so the ensuing manhunt can be extensive. Hammond responded by denying he ever pointed the gun at an officer.

Simms' comment was not "express questioning or its functional equivalent." *Innis*, 446 U.S. at 300–01. Simms made his comment in an offhanded manner, in an effort to answer Hammond's question about the scope of the search. While this Court considers police action primarily from the perspective of the suspect in determining whether that action was "one the police should have known was reasonably likely" to elicit an incriminating response, the officer's intent is still a relevant factor -- for instance, "where a police practice is designed to elicit an incriminating response from the accused" the police practice more closely fits the definition of an "interrogation." *Id.* at 301& n.7. Based on the evidence produced at the suppression hearing, this Court finds Simms had no such design in replying to Hammond's question. *See Woods*, 711 F.3d at 741 (concluding "What is in your pocket?" is not an interrogation under *Miranda* but a "natural and automatic response to the unfolding events during the normal course of an arrest" not designed to elicit an incriminating response). In the

6

end, the Government may elect not to introduce evidence of this portion of the exchange at trial, given its focus on uncharged conduct. That decision will turn on considerations of relevance, not *Miranda*.

Because none of Hammond's unwarned, June 21 comments amount to "interrogation," the exclusionary rule does not bar their introduction into evidence.

### 2. Statements to Ohio State Highway Patrol

Hammond faces a different obstacle in seeking to suppress his June 22 statements to Ashenfelter during questioning at the Wood County Justice Center: waiver. A defendant's incriminating statements made during the course of custodial interrogation can be used against that defendant at trial if made after a knowing, intelligent, and voluntary waiver of *Miranda* rights. Waiver can come in a variety of forms, but in each case this Court asks "whether the suspect knew that he could choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking any time." *United States v. Adams*, 583 F.3d 457, 467 (6th Cir. 2009) (internal quotation and brackets omitted).

The waiver form plainly informed Hammond of those rights (*see* Doc. 15-1) (advising Hammond of his *Miranda* rights and option to cease questioning at any time). Ashenfelter testified, and the interrogation video shows, Hammond signed the form before questioning began. Ashenfelter testified Hammond appeared to understand the consequences of his signature. Based on the evidence presented at the suppression hearing, this Court concludes Hammond knew and understood the consequences of having voluntarily signed the waiver.

At the suppression hearing, defense counsel attacked the effectiveness of this waiver. Hammond finds it significant that he made the incriminatory statements during questioning focused, in part, on possible crimes other than those charged in the present Indictment. Hammond argues that given this turn in the questioning, he either: (1) was "surprised" into making damning statements with

7

respect to events on I-280; or (2) cooperated with police by being forthcoming about the revolver to avoid being tied to any Lincoln Park-area crime. For these reasons, Hammond argues his *Miranda* waiver was ineffective.

Hammond's possible motivation for proceeding with questioning is just that: a motive. Hammond may well have sought leniency through loquaciousness, but that fact alone does not establish the waiver form was not validly executed. Likewise, the Supreme Court has squarely rejected claims like Hammond's "surprise" argument. In *Colorado v. Spring*, 479 U.S. 564 (1987), the Court considered the argument of a defendant who, like Hammond, sought to render his *Miranda* waiver ineffective by claiming "police trickery and deception" resulted when an interrogation unexpectedly broached that defendant's involvement in a murder. *Id.* at 575–76. "[T]he failure of the law enforcement officials to inform [the defendant] of the subject matter of the interrogation," the Court concluded, "could not affect [that defendant's] decision to waive his Fifth Amendment privilege in a constitutionally significant manner." *Id*. at 577. So it is here. The Government's evidence shows Hammond knowingly, voluntarily, and intelligently waived his *Miranda* protections before being questioned.

For all the above reasons, Hammond's Motion to Suppress (Doc. 14) is denied.

IT IS SO ORDERED.

                 s/ *Jack Zouhary*
                 JACK ZOUHARY
                 U. S. DISTRICT JUDGE

                 October 29, 2013